United States District Court
Southern District of Texas
**ENTERED**
June 10, 2020
David J. Bradley, Clerk

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| JANA LANDRY, individually, and as next of kin and personal representative of MATTHEW NELSON, deceased, | § § § § | |
| Plaintiff, | § § | |
| VS. | § § | CIVIL ACTION NO. H-17-370 |
| TEXAS DEPARTMENT OF CRIMINAL JUSTICE, *et al.*, | § § § | |
| Defendants. | § § | |

**MEMORANDUM AND OPINION GRANTING SUMMARY JUDGMENT**

Matthew Nelson had just begun to serve a 63-year sentence in the Gurney Unit of the Texas Department of Criminal Justice when he committed suicide by hanging himself with a bed sheet. He had previously attempted suicide while in the Harris County Jail, causing the Jail's medical staff to place him on suicide precautions. Within a week, the Jail removed those precautions, based on mental-health exams the Jail's medical staff performed. When the County transferred Nelson to the Texas Department of Criminal Justice, it did not warn the unit of Nelson's suicidal history, other than by providing Nelson's medical records. The records documented his history of mental health problems and suicide attempts.

Jana Landry, Nelson's mother, sued Harris County, the Texas Department of Criminal Justice, and several individual medical and correctional officers, asserting Eighth and Fourteenth Amendment violations under § 1983, claims under the Americans with Disabilities Act and the Rehabilitation Act, and state-law malpractice, wrongful-death, and survival claims. The

defendants moved for summary judgment, and Landry responded, addressing only her Eighth Amendment claim against Harris County.

After considering the briefs, the summary judgment record, and the applicable law, the court grants the defendants' motions for summary judgment on all claims. The reasons are explained in detail below.

## I.    Background

### A.    Nelson's Time in the Harris County Jail

Matthew Nelson was charged with, and pleaded not guilty to, possession with intent to deliver 4 to 200 grams of methamphetamine. (Docket Entry No. 90-1 at 1). He was booked into the Harris County Jail on November 14, 2014. (Docket Entry No. 90-3 at 2). Nelson rejected a plea deal and went to trial, and the jury convicted him. (Docket Entry No. 90-1 at 1; Docket Entry No. 90-2 at 30). On January 20, 2015, he was sentenced to serve 63 years in prison. (Docket Entry No. 90-3 at 2).

Nelson frequently saw medical and mental-health staff while at the Harris County Jail. On his first day there, Nelson jumped from a bench, trying to land on his head. (Docket Entry No. 90-2 at 1–4). The records from Nelson's doctor visit that day show that he had been using crystal meth that morning and that he told the doctor he was suicidal. (*Id.* at 4). The next day, Nelson saw Dr. Conrad Gibby, who wrote in his medical progress note that Nelson felt depressed "because he [felt] he was wrongly accused and [would] be [in jail] the rest of his life." (*Id.* at 6). Nelson complained of severe back pain, so Dr. Gibby prescribed medicine for that pain and for his hypertension. (*Id.* at 6–8). Dr. Gibby told Nelson to follow up with the Chronic Care Clinic in three weeks for his hypertension. (*Id.* at 8).

Harris County then sent Nelson to Dr. Sunil Athavale, who conducted an initial psychiatric assessment. (*Id.* at 30–31). Dr. Athavale stated that Nelson's history of drug and alcohol abuse may have caused his psychiatric symptoms. (*Id.* at 30). Nelson told Dr. Athavale that he had been admitted to psychiatric care as a teenager for "acting out," that he had cut his wrists 15 years earlier, and that his jump off the bench the day before had been a suicide attempt. (*Id.* at 30). Dr. Athavale admitted Nelson to the Jail's mental health unit and placed him on suicide precautions, noting that "he wants to try to find any way he can to die." (*Id.* at 31). Dr. Athavale also prescribed medicine for Nelson's depression. (*Id.* at 31). Licensed vocational nurses in the Jail's mental health unit admitted Nelson. The nurses' notes stated that Nelson intended to commit suicide. (*Id.* at 9).

Over the next two weeks, Nelson appeared to improve. On November 16, 2014, Hazel Wooding, a nurse practitioner in the mental health unit, examined Nelson and continued him on suicide precautions, even though he appeared to be calm, cooperative, and in no distress. (*Id.* at 12). The next day, Dr. Najeed Riaz saw Nelson. (*Id.* at 14). Dr. Riaz noted that Nelson denied having suicidal thoughts, but the doctor continued the suicide precautions. (*Id.*). Dr. Riaz saw Nelson again the next day and conducted a suicide-risk assessment. (*Id.* at 26–28). Nelson scored in the low range, and Dr. Riaz then removed Nelson from suicide precautions. (*Id.* at 26–27, 32–33). On November 24, 2014, Dr. Riaz noted that Nelson appeared calm, pleasant, and cooperative, and that he denied suicidal thoughts. (*Id.* at 28). Dr. Riaz discharged Nelson from the mental health unit to a stepdown unit and asked for a follow-up appointment with the mental health unit in one month. (*Id.* at 28–29). Dr. Riaz did not change Nelson's prescriptions for hypertension, pain, or depression. (*Id.*).

Medical staff saw Nelson the day after he was discharged and noted that he was eating, sleeping at night, denied suicidal thoughts or acute psychological distress, and that he was pleasant, goal-oriented, and logical. (*Id.* at 34–35).

Two weeks later, Nelson had a mental-health checkup with Angela Jones, a Licensed Practitioner of the Healing Arts. Jones reported that Nelson was taking his medications and that he was feeling less depressed. (*Id.* at 36–37). Nelson told Jones that his 63-year sentence had triggered his suicidal thoughts, but he had hired a new attorney and was hopeful about an appeal. (*Id.* at 36). Nelson continued to deny suicidal intent or psychological distress, and Jones recommended Nelson's transfer to the Jail's general population. (*Id.* at 37).

Nelson continued to show improvement. In December 2014, Registered Nurse Rosemary Ojih did a comprehensive health assessment. (*Id.* at 20). She noted Nelson's history of attempted suicide; once by trying to hit his head on the floor during intake and once by cutting himself years earlier. (*Id.* at 18). Nelson told her that he had no plans to commit suicide. (*Id.*).

Later that month, another nurse, Mansong Ntekim, saw Nelson to monitor his mental-health medications. (*Id.* at 22). Nelson told her that he was doing well on his medicine. (*Id.*). She wrote that Nelson denied feeling depressed, and that he appeared alert and calm, with normal speech. (*Id.*). A few days later, Dr. Mireya Hansen saw Nelson for his one-month mental-health follow-up appointment. Nelson continued to report that he did not have suicidal thoughts or plans and was in a good mood. (*Id.* at 24). Dr. Hansen found no side effects from Nelson's medicine and wrote that no changes were needed. (*Id.*).

Nelson also visited the Jail's Chronic Care Clinic for his hypertension. A physician's assistant, Sharon Lambi, examined Nelson and took his blood-pressure reading. (*Id.* at 42–44). Nelson told Lambi that his blood pressure had been normal two days earlier, but that it was

"always high" in a doctor's clinic.  (*Id.* at 43).  Lambi did not change Nelson's medications.  (*Id.* at 43–44).  Nelson continued to show high blood-pressure readings.  When Dr. Syed Rahman saw Nelson on December 26, 2014, he increased the strength of Nelson's medicine.  (*Id.* at 48–50).  When Lambi saw Nelson again on December 31, 2014, his heart rate and blood pressure remained high.  (*Id.* at 52).  Lambi prescribed two new medications for blood pressure and cholesterol, and she ordered his blood pressure to be monitored.  (*Id.* at 53–54).

Two and a half months passed without relevant incidents.  But in March 2015, another inmate told Detention Officer Girma Abebe that Nelson had cut his neck.  (Docket Entry No. 90-11 at 1).  Officer Abebe found Nelson using a pay phone and saw "a big gash" on Nelson's neck.  (*Id.*).  She called for other officers.  As she approached Nelson, she saw blood on his mattress.  (*Id.*).  She handcuffed Nelson and led him out of the cellblock.  (*Id.*).  As she led him away, she asked Nelson what had happened to his neck.  Nelson replied, "I cut myself while shaving my face."  (*Id.*).  While Officer Abebe was leading Nelson to the Jail's clinic, he broke loose from her grip and tried to slam his head against the wall.  (*Id.*).  A nurse treated Nelson, cleaned his cut, and referred him to psychiatry.  (*Id.*).

Nelson saw both Dr. Gibby and another psychiatrist, Dr. Pilar Laborde.  (Docket Entry No. 90-2 at 59–61).  Dr. Laborde reported that Nelson "vehemently denie[d]" that the cut on his neck was a suicide attempt.  (*Id.* at 59).  Dr. Laborde wrote that Nelson showed symptoms consistent with ADHD and appeared to be "extremely depressed" because he thought his girlfriend was about to break up with him.  (*Id.*).  Dr. Laborde told Nelson his suspicion that Nelson cut his neck in "one more on a list of suicide 'rehearsals,'" but Nelson "adamantly denied it."  (*Id.*).  Dr. Laborde performed another suicide-risk assessment and again determined that Nelson belonged in the Jail's general population.  (*Id.* at 66–67).  Nelson scored slightly higher

than before, but he was still within the low-risk range. (*Id.* at 67). Dr. Laborde wrote new prescriptions for mood stability, sleep, anxiety, depression, and ADHD. (*Id.* at 65).

On March 30, 2015, Nelson had a panic attack. (Docket Entry No. 90-12 at 1). A Detention Officer found Nelson and brought him out of his cellblock to check on him. (*Id.*). Nelson told the officer that he had missed a dose of his pain medicine and was having a panic attack because of severe pain in his legs. (*Id.*). The officer called the clinic, but the responding nurse said that she could not give Nelson medicine so close to the next prescribed dose. (*Id.*). Nelson then stood up and ran head-first into a wall. (*Id.*). When Nurse Stacy Barton treated Nelson in the clinic, Nelson told her that he "ran [his] head into the wall to knock [himself] out because no one will listen to [him] about [his] legs." (Docket Entry No. 90-2 at 68–69).

### B.     Nelson's Transfer to the Texas Department of Criminal Justice's Gurney Unit

The morning of April 1, 2015, Harris County transferred Nelson to the Texas Department of Criminal Justice's Gurney Transfer Facility. (Docket Entry No. 90-7 at 5). Nelson's medical records from the Harris County Jail, which documented his visits to the mental health unit, along with his previous suicide attempts, arrived with him. (Docket Entry No. 90-7 at 2; Docket Entry No. 90-8 at 9–10; Docket Entry No. 90-10 at 6). Mary Squyres, a licensed vocational nurse, performed Nelson's initial intake screening. (Docket Entry No. 90-13). Squyres's interview revealed Nelson's back injury and high blood pressure, but no suicide history. (*Id.* at 1–2). The intake questionnaire that Squyres completed indicated that Nelson had no history of suicide and no current suicidal thoughts. (*Id.*). Nelson signed the completed questionnaire. (*Id.* at 2).

Stephanie Cruz, an administrative technician at the Gurney Unit, conducted an intake-processing psychological screening. While Nelson told Cruz that he had been admitted to a

mental hospital as a teenager, he denied current suicidal thoughts.  (Docket Entry No. 90-14 at 1–4).  Kelli Taylor, the Gurney Unit's psychotherapist, assessed Nelson's mental-health status.  (Docket Entry No. 90-8 at 4–6).  She noted that Nelson voiced no mental-health complaints and did not display signs of suicidal intent.  (Docket Entry No. 90-16).  Sergeant Christopher Thorn conducted another screening.  (Docket Entry No. 90-8 at 11–14).  Nelson denied having any mental-health issues, and Thorn did not refer Nelson for any mental-health treatment.  (Docket Entry No. 90-18).

Nelson was sent to Administrative Separation Housing because of his 63-year sentence.  (Docket Entry No. 90-7 at 3–4).  Sergeant Kyle Beusch, and Officers Donna Lane and Cory Peach were on duty in Nelson's area when he arrived.  Nelson told Officer Peach that he was claustrophobic.  (Docket Entry No. 90-20 at 6–7).  Sergeant Beusch asked another inmate to talk to Nelson to help calm him down.  (Docket Entry No. 90-19 at 4–5).  When Sergeant Beusch left Nelson's cell around 3:00 p.m., Nelson was sitting on his bunk and reading a magazine.  (Docket Entry No. 90-22).

Just after 5:00 p.m., Officer Lane was conducting security checks and discovered Nelson hanging by a bedsheet from a light fixture in his cell.  (Docket Entry No. 90-23).  He was dead.  (Docket Entry No. 90-24).

### C.    Procedural History

Landry sued as the personal representative of her deceased son, naming Harris County, the Texas Department of Criminal Justice, and several state and county employees.  (Docket Entry No. 1).  She later filed a second amended complaint.  (Docket Entry No. 41).  After she voluntarily dismissed some claims, and the court dismissed others, Landry asserted six causes of action: (1) disability discrimination under the Americans with Disabilities Act and Rehabilitation

Act, against Harris County and the Texas Department of Criminal Justice; (2) Eighth and Fourteenth Amendment violations under 42 U.S.C. § 1983, against all defendants; (3) municipal liability under § 1983, against Harris County for failing to adequately fund the Harris County Jail; (4) medical malpractice under Texas law, against Sharon Lambi; (5) wrongful death under Texas law, against all defendants; and (6) survival claims, against all defendants. (Docket Entry Nos. 41, 44, 45, 53, 58).

Harris County, the Texas Department of Criminal Justice, and the remaining individual defendants—Sharon Lambi, Stephanie Cruz, Kyle Beusch, Cory Peach, and Donna Lane—moved for summary judgment. (Docket Entry Nos. 83, 89). Landry responded, addressing solely her Eighth Amendment claim against Harris County, (Docket Entry No. 101), and the defendants replied. (Docket Entry Nos. 104, 105). The defendants moved for leave to file a notice of supplemental authority after the Fifth Circuit issued *Smith v. Harris County*, 956 F.3d 311 (5th Cir. 2020), and the court allowed the parties to file a supplemental brief addressing *Smith*. (Docket Entry Nos. 106, 107). Harris County filed a brief addressing *Smith*. (Docket Entry No. 108).

The parties' arguments are examined below under the legal standards and the record evidence.

## II.    The Applicable Legal Standards

### A.    Summary Judgment

"Summary judgment is appropriate only when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Shepherd on Behalf of Estate of Shepherd v. City of Shreveport*, 920 F.3d 278, 282–83 (5th Cir. 2019) (quoting Fed. R. Civ. P. 56(a)). "A material fact is one that might affect the outcome of

the suit under governing law," and "a fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Renwick v. PNK Lake Charles, L.L.C.*, 901 F.3d 605, 611 (5th Cir. 2018) (quotations omitted).  The moving party "always bears the initial responsibility of informing the district court of the basis for its motion," and identifying the record evidence "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

"Where the non-movant bears the burden of proof at trial, 'the movant may merely point to the absence of evidence and thereby shift to the non-movant the burden of demonstrating that there is an issue of material fact warranting trial.'" *Kim v. Hospira, Inc.*, 709 F. App'x 287, 288 (5th Cir. 2018) (alteration omitted) (quoting *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.*, 783 F.3d 527, 536 (5th Cir. 2015)).  The moving party must demonstrate the absence of a genuine issue of material fact, but it need not negate the elements of the nonmovant's case. *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 335 (5th Cir. 2017).  "If the moving party fails to meet [its] initial burden, the motion must be denied, regardless of the nonmovant's response." *Pioneer Expl., L.L.C. v. Steadfast Ins. Co.*, 767 F.3d 503, 511 (5th Cir. 2014) (quoting *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001)).

"When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings." *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010).  The nonmovant must identify specific evidence in the record and articulate "the precise manner in which" that evidence supports that party's claim. *Willis v. Cleco Corp.*, 749 F.3d 314, 317 (5th Cir. 2014) (quoting *Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994)).  "A party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence." *Lamb v. Ashford Place*

9

*Apartments L.L.C.*, 914 F.3d 940, 946 (5th Cir. 2019) (quotation omitted). In deciding a summary judgment motion, "the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his or her favor." *Waste Mgmt. of La., L.L.C. v. River Birch, Inc.*, 920 F.3d 958, 972 (5th Cir. 2019) (alterations omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)).

### B.     Qualified Immunity

Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "In reviewing a motion for summary judgment based on qualified immunity, [courts] undertake a two-step analysis." *Luna v. Mullenix*, 773 F.3d 712, 718 (5th Cir. 2014). "First, [courts] ask whether the facts, taken in the light most favorable to the plaintiffs, show the officer's conduct violated a federal constitutional or statutory right." *Id.* (citing *Tolan*, 572 U.S. at 655–56). "Second, [courts] ask 'whether the defendant's actions violated clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Flores v. City of Palacios*, 381 F.3d 391, 395 (5th Cir. 2004)). "A court has discretion to decide which prong to consider first." *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 236 (2009)). "Claims of qualified immunity must be evaluated in the light of what the officer knew at the time he acted, not on facts discovered subsequently." *Luna*, 773 F.3d at 718. But "[a]s the Supreme Court has recently reaffirmed, 'in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *Id.* (quoting *Tolan*, 572 U.S. at 651).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lytle v. Bexar County*, 560 F.3d 404, 410 (5th Cir. 2009) (quotations omitted). "When considering a defendant's entitlement to qualified immunity, [a court] must ask whether the law so clearly and unambiguously prohibited his conduct that 'every reasonable official would understand that what he is doing violates [the law].'" *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011) (en banc) (quoting *Ashcroft v. Al-Kidd*, 563 U.S. 731, 741 (2011)). "To answer that question in the affirmative, [the court] must be able to point to controlling authority — or a 'robust consensus of persuasive authority' — that defines the contours of the right in question with a high degree of particularity." *Id.* (quoting *Al-Kidd*, 563 U.S. at 742).

"Qualified immunity balances two important interests — the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* Qualified immunity "gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quotations omitted). "[W]hile the Supreme Court has stated that 'courts should define the 'clearly established' right at issue on the basis of the 'specific context of the case,' it has also recently reminded [courts] that [they] 'must take care not to define a case's 'context' in a manner that imports genuinely disputed factual propositions.'" *Luna*, 773 F.3d at 724–25 (quoting *Tolan*, 572 U.S. at 657). A plaintiff has the burden of overcoming the qualified immunity defense. *Bennett v. City of Grand Prairie*, 883 F.2d 400, 408 (5th Cir. 1989).

11

### III.     Analysis

#### A.     The § 1983 Claims

Landry asserts § 1983 claims against Harris County and the individual defendants for allegedly violating Nelson's Eighth Amendment[1] rights.  (Docket Entry No. 41 at 21–26).  In her response to the defendants' summary judgment motions, Landry addressed only her claim against Harris County.

In the prison context, "[i]t is the Eighth Amendment that is relevant to claims of the denial of medical care."  *Carlucci v. Chapa*, 884 F.3d 534, 540 (5th Cir. 2018).  "[T]he Due Process Clause affords no greater protection than does the Cruel and Unusual Punishments Clause."  *Id.* (alteration omitted) (quoting *Whitley v. Albers*, 475 U.S. 312, 327 (1986)).

"The denial or delay of treatment for serious medical needs violates the Eighth Amendment, which prohibits cruel and unusual punishment."  *Id.* at 538; *Estelle v. Gamble*, 429 U.S. 97, 104 (1976).  "To show a violation of the Eighth Amendment, the plaintiff must prove: (1) 'objective exposure to a substantial risk of serious harm'; and (2) 'that prison officials acted or failed to act with deliberate indifference to that risk.'"  *Carlucci*, 884 F.3d at 538 (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345–46 (5th Cir. 2006)).  A prison official violates the Eighth Amendment by "deliberate indifference to a prisoner's serious medical needs, which equates to the 'unnecessary and wanton infliction of pain.'"  *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153,

---

[1]  In Landry's Second Amended Complaint, she alleged both Eighth and Fourteenth Amendment violations.  (Docket Entry No. 41 at 21–26).  Nelson was a prisoner, not a pretrial detainee, when he committed suicide, so the Eighth Amendment applies.  And in the prison context, "the Due Process Clause affords no greater protection than does the Cruel and Unusual Punishments Clause."  *Carlucci*, 884 F.3d at 540.  Both parties present the issue under the deliberate-indifference standard, and Landry did not argue that the evidence supports a "conditions of confinement" claim under the Fourteenth Amendment, for Harris County's treatment of Nelson while he was detained at the Harris County Jail

173 (1976)).  A serious medical condition is "one for which treatment has been recommended or for which the need is so apparent that even laymen would recognize that care is required." *Id.* (quoting *Gobert*, 43 F.3d at 345 n.12).  The test is "medical necessity," not "desirability." *Id.* (quoting *Woodall v. Foti*, 648 F.2d 268, 272 (5th Cir. Unit A 1981)).

Deliberate indifference is "a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown v. Callahan*, 623 F.3d 249, 255 (5th Cir. 2010) (quoting *Bd. of Cty. Comm'rs of Bryan Cty. v. Brown*, 520 U.S. 397, 410 (1997)).  It requires the actor to have "a subjectively culpable state of mind." *Arenas v. Calhoun*, 922 F.3d 616, 620 (5th Cir. 2019) (quoting *Farmer v. Brennan*, 511 U.S. 825, 846 n.9 (1994)).  "A prison official displays deliberate indifference only if he (1) 'knows that inmates face a substantial risk of serious bodily harm' and (2) 'disregards that risk by failing to take reasonable measures to abate it.'" *Id.* (quoting *Gobert*, 463 F.3d at 346).  "Medical treatment that is merely unsuccessful or negligent does not constitute deliberate indifference, 'nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.'" *Id.* (quoting *Gobert*, 463 F.3d at 346).  Deliberate indifference is "an extremely high standard to meet." *Arenas*, 922 F.3d at 620 (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 756 (5th Cir. 2001)).

### 1.    Harris County

To hold Harris County liable for its officers' alleged constitutional violations, Landry must also show that: (1) the constitutional violation was caused as the direct result of the execution of an official "custom" or "policy"; (2) the custom or policy was approved or

---

before he was moved to the Gurney Unit.  The court analyzes the issue that the parties briefed: whether the defendants were deliberately indifferent to a serious medical need.

sanctioned by the County's final policymaker; (3) the final policymaker acted with deliberate indifference; and (4) the custom or policy was the "moving force" behind the violation.  *See Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 403–04 (1997); *Doe v. Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1416 (5th Cir. 1997) (en banc).  "Municipal liability cannot be sustained under a theory of *respondeat superior*.  [T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability."  *Rivera v. Hous. Indep. Sch. Dist.*, 349 F.3d 244, 247 (5th Cir. 2003) (alteration in original) (citing *Brown*, 520 U.S. at 403; *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001)) (quotations omitted).

Landry argues that Harris County violated Nelson's Eighth Amendment rights by not sufficiently warning the Gurney Unit of Nelson's suicide attempts when it transferred Nelson from the Harris County Jail to the Texas Department of Criminal Justice.  Landry argues that it is "blindingly obvious that if an inmate is suicidal," the prison should not allow the inmate access to anything that the inmate could use to hang himself, and a prison guard should watch the inmate so that "suicide is next to impossible."  (Docket Entry No. 101 at 8).  Landry points to the following in arguing that Harris County is liable for its officers' alleged violations: a 2009 Department of Justice Letter, which found that the Harris County Jail failed to provide detainees with adequate medical or mental health care, or protection from "serious physical harm" and "life safety hazards"; the Harris County Jail's inmate-transfer form, which lacked a "box" to check indicating a current suicide risk; and a March 14, 2015 letter that Landry wrote to the Harris County Sheriff, Adrian Garcia, which mentioned Nelson cutting his neck in the Jail. (Docket Entry No. 101 at 3, 5–8).  To support an inference that a policy or custom was the motivating force behind the alleged violation, however, Landry must show an underlying

14

constitutional violation.  *See Lock v. Torres*, 694 F. App'x 960, 965 (5th Cir. 2017) ("Municipal liability will not attach if the complaining party 'has suffered no constitutional injury' at the hands of a municipal employee.") (quoting *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986)).

Landry's claim against Harris County turns on whether its officers acted with deliberate indifference to Landry's known suicide risk.  To have acted with deliberate indifference, the defendants must have been "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also [have] draw[n] the inference" and disregarded the risk.  *Farmer*, 511 U.S. at 837; *cf. Arenas*, 922 F.3d at 621 ("Suicide is an objectively serious harm implicating the state's duty to provide adequate medical care.").  The record must show a genuine factual dispute material to determining that Harris County's employees had actual, subjective awareness of a substantial risk of serious harm.  The Supreme Court has emphasized that a "prison official cannot be found liable" unless he or she "knows of" an excessive risk to inmate health or safety.  *Id.*  A failure to act "unaccompanied by knowledge of a significant risk of harm" is insufficient to establish a constitutional violation.  *Id.* at 837–38. It is not enough to identify a significant risk that the official "should have perceived but did not." *Id.* at 838.  The standard is not negligence.  *Brown v. Bolin*, 500 F. App'x 309, 315 (5th Cir. 2012).

The record evidence shows that the Harris County Jail's medical staff and correctional officers were "aware of facts from which the inference could be drawn that a substantial risk of serious harm" existed.  *Farmer*, 511 U.S. at 837.  Nelson was admitted multiple times to the Jail's mental health unit.  Dr. Athavale placed Nelson on suicide precautions and prescribed him anti-depression drugs; Nurse Practitioner Wooding continued Nelson on suicide precautions; Dr.

Riaz also continued Nelson on precautions; Nurse Ojih noted Nelson's suicidal history; and Dr. Laborde saw Nelson after he cut his neck. The Harris County Jail corrections officers also witnessed the injuries Nelson inflicted on himself. Officer Abebe saw Nelson with a "gash on the left side of his neck," although Nelson explained that he had cut himself while shaving; Nelson broke loose of Officer Abebe's grip and "tried to slam his head against the wall"; and Sergeant Holmes later watched Nelson run headfirst into a wall. Nelson's multiple visits to the Jail's clinic, where medical personnel placed him on, and continued him on, suicide precautions, as well as the correctional officers' awareness of Nelson's attempts to harm himself, shows that the officers and medical personnel were aware that Nelson had attempted suicide while in the Harris County Jail.

The record does not, however, show that Harris County Jail personnel subjectively drew the inference that Nelson was still at substantial risk of committing suicide when he was transferred to the Gurney Unit. Jail medical personnel treating Nelson took him off suicide precautions when the Jail transferred him from its mental health unit to a stepdown unit, four months before moving him to the Gurney Unit. The Jail's medical staff recorded several instances when Nelson denied suicidal thoughts and appeared to improve. On November 18, 2014, Dr. Riaz conducted a suicide-risk assessment and removed Nelson from suicide precautions after finding that he had improved. Fifteen days after Nelson moved to the stepdown unit, Licensed Practitioner Angela Jones examined him and reported that his depression levels had decreased, and he was hopeful that his new attorney would appeal his sentence. On December 11, 2014, Nurse Ojih conducted a comprehensive health exam and noted Nelson's past suicide attempts but reported that he did not currently have suicidal thoughts. And Nurse

Ntekim reported that Nelson was doing well on his medications, and that he denied feeling depressed or suicidal.

Nelson also vigorously denied that his two most recent attempts to harm himself were suicide attempts.  Dr. Laborde examined Nelson after he cut his neck and reported that Nelson "vehemently" denied attempting suicide.  Nelson explained that he had cut himself while shaving.  Nurse Barton saw Nelson after he rammed his head into a wall, and Nelson told her that he tried to knock himself out because no one would "listen to [him] about [his] legs."

Landry does not dispute this evidence.  She asserts that Nelson told her several times that he wanted to commit suicide while in the Harris County Jail.  (Docket Entry No. 101-4 at 35). Nelson's medical record from March 30, 2015, reflects a history of mental-health problems and two suicide attempts, one by hitting his head on the floor, and one by cutting himself years earlier.  (Docket Entry No. 101-1 at 7).  Landry testified in her deposition that she and another friend called the Harris County Jail the day that Nelson cut his neck to warn the guards that Nelson was suicidal.  (Docket Entry No. 101-4 at 15).  Landry also testified that later, she wrote to Sheriff Garcia to commend the officers and medical staff for responding when Nelson cut his neck.  (Docket Entry No. 101-4 at 16).  None of this contradicts the evidence that the Harris County Jail's medical staff examined Nelson several times after releasing him from the mental health unit, each time finding that he denied suicidal thoughts and was improving.  Landry's testimony that her son had told her on earlier occasions that he wanted to commit suicide does not show that the Jail's medical staff or correctional officers realized that Nelson remained suicidal, even after his medical exams showed that he was improving.  The undisputed record evidence on the fact and reason that Nelson was no longer on suicide precautions; that he denied attempting suicide and explained his injuries as a shaving accident and an attempt to dull the pain

17

in his legs; and his apparently improved mental outlook and stability, is inconsistent with any inference of deliberate indifference.

Fifth Circuit case law supports this result.  In *Flores v. County of Hardeman*, 124 F.3d 736, 737 (5th Cir. 1997), the plaintiff sued the county sheriff, alleging that he was deliberately indifferent to the risk that an inmate would commit suicide.   The sheriff had initially placed the inmate on suicide precautions because, "having known [the inmate] all of his life, he felt that [the inmate] was not acting like himself."  *Id.*  But after the first night, when the inmate had neither threatened or attempted suicide, nor exhibited overt signs that he intended to do so, the sheriff placed the inmate in a larger cell where he was checked only once an hour.  *Id.*  The inmate hung himself with a piece of blanket fastened from a shower rod.  *Id.*  The Fifth Circuit affirmed the district court's grant of summary judgment, stating that the sheriff had "exercised his judgment that the risk had passed and removed the special procedures," and noted that "[w]hile it is easy in hindsight to conclude that [the sheriff's] decision to discontinue the protective measures after twelve hours was ill advised, it was not, as a matter of law, deliberately indifferent."  *Id.* at 738–39.

The undisputed record evidence shows that the medical staff removed Nelson from suicide precautions and transferred him from the mental health unit to the stepdown unit, because he was not expressing suicidal thoughts and appeared to be improving.  Nelson's suicide-risk assessment scores improved, and he continually reported decreased depression.  He denied that his neck cut or head injury were suicide attempts, explaining that he cut himself while shaving and had tried only to dull the pain in his legs.  The Jail staff's apparent failure to recognize that Nelson was suicidal when he was transferred to the Gurney Unit shows that the County officers did not subjectively draw an inference that a substantial risk existed.  While hindsight may show

that the lack of recommended continued precautions and a clearer warning to the Gurney Unit was ill advised, it was not deliberately indifferent.

Nor does the record show that the Harris County Jail staff recklessly disregarded the risk that Nelson might commit suicide. The Texas Department of Criminal Justice's intake documents included Nelson's medical records from the Harris County Jail. (Docket Entry No. 90-7 at 2; Docket Entry No. 90-8 at 9–10; Docket Entry No. 90-10 at 6). These records show his suicide attempts and history of mental-health problems. (*Id.*). The Gurney Unit's Health Services received them when Nelson arrived. (Docket Entry No. 101-7 at 26). Landry testified in her deposition that she read an unidentified document, from an investigation into Nelson's death, stating that Harris County had not transferred Nelson's health records to the Gurney Unit. (Docket Entry No. 101-4 at 19). But Landry does not identify, other than in her deposition testimony, any evidence in the record disputing that the Gurney Unit received Nelson's medical records when Nelson arrived. Landry's hearsay deposition statement does not identify evidence that gives rise to a genuine factual dispute material to determining whether Harris County had sent the Gurney Unit Nelson's medical records when Nelson went through intake. *See* FED. R. EVID. 801; *Bellard v. Gautreaux*, 675 F.3d 454, 460 (5th Cir. 2012) (citing *Martin v. John W. Stone Oil Distrib., Inc.*, 819 F.2d 547, 549 (5th Cir. 1987)) ("On a motion for summary judgment, the evidence proffered by the plaintiff to satisfy his burden of proof must be competent and admissible at trial.").

Landry argues that Harris County could have taken any number of other steps to warn the Gurney Unit ahead of Nelson's arrival, rather than relying on the medical records documenting Nelson's suicide attempts. But "[n]egligence or even gross negligence is not enough." *Brown*, 500 F. App'x at 315. That Harris County could have, or even should have, warned the Gurney

Unit in advance, rather than sending Nelson's medical records along with his arrival, does not show that County officers recklessly disregarded subjectively known risks.

Finally, Landry's reliance on evidence of a policy or widespread custom is misplaced. She has identified no constitutional violation caused by a municipal employee. Without an underlying constitutional violation, Landry cannot hold Harris County liable based on evidence of an unrelated 2009 Department of Justice Investigation, or with assertions that Harris County used deficient inmate-transfer forms.

Landry has not identified evidence in the record that creates a genuine factual dispute material to determining whether the Harris County Jail employees were deliberately indifferent to the risk that Nelson might commit suicide. Because she cannot show an underlying constitutional violation, Landry cannot hold Harris County liable through its policies or customs. Summary judgment is granted on Landry's § 1983 claims against Harris County.

### 2.    The Individual Defendants

The individual defendants[2] Sharon Lambi, Stephanie Cruz, Kyle Beusch, Donna Lane, and Cory Peach, all assert qualified immunity and argue that their actions were not objectively unreasonable. Landry did not address qualified immunity in her response. Nor did she identify evidence showing how any individual defendant's conduct was objectively unreasonable.

Sharon Lambi, a physician's assistant in the Harris County Jail, states that she did not have suicide-prevention training. She worked in the Jail's Chronic Care Center, where she treated patients for chronic conditions such as asthma, diabetes, and blood disorders. (Docket

---

[2] Landry's amended complaint also asserts claims against Steven Beusch, Mary Squyres, and Kelli Taylor. Landry never served these three defendants with process. Landry's claims against them are dismissed, with prejudice, because like the other individual defendants, Landry has not identified evidence that would support her claims against them.

Entry No. 90-25 at 2).  Lambi prescribed Nelson medicine for hypertension, and she testified that she was unaware of any psychiatric side effects.  (*Id.* at 8).  Several mental-health doctors who saw Nelson after her kept his prescription in place, although they had the ability to change or discontinue it.  (*Id.* at 19–20).  The record provides no support for an inference that Lambi knew Nelson was at risk of committing suicide when he was transferred months later.

Stephanie Cruz, an administrative technician, conducted Nelson's intake processing at the Gurney Unit.  (Docket Entry No. 83-1 at 60–63).  During intake, when Cruz asked Nelson how he was feeling, he responded that he was "Ok."  (*Id.* at 61).  Nelson stated that he had been hospitalized for depression when he was 13.  (*Id.*).  Importantly, Nelson answered "no" when Cruz asked him directly if he had ever tried to commit suicide, to harm himself, or if he was currently thinking about suicide.  (*Id.*).  This evidence undermines any inference that Cruz was aware of a current suicide risk.

Officers Donna Lane and Cory Peach were on duty in Nelson's housing area in the Gurney Unit at the time Nelson committed suicide.  (Docket Entry 84-4 at 11).  Nelson told Officer Peach that afternoon that he was claustrophobic and could not live in the cell.  (*Id.* at 14–16).  Sergeant Beusch arrived a short time later and talked to Nelson, who again said that he was claustrophobic.  (Docket Entry No. 83-1 at 25).  Beusch asked another inmate to speak with Nelson, and after ten minutes, Nelson appeared calm.  (*Id.*).  Beusch completed a referral request to mental health for Nelson, noting his complaint about claustrophobia.  (*Id.*).  Nelson later asked Officer Lane for an inmate-referral-request form, and Lane provided Nelson with the form and a pen.  (Docket Entry No. 84-3 at 24–25).  Nelson committed suicide later that same afternoon. (Docket Entry No. 83-1 at 9).  The record does not support an inference that Nelson's complaints about claustrophobia alerted the officers that Nelson was planning to commit suicide.

21

Landry does not dispute this evidence.  She states only that Officers Peach and Lane and Sergeant Beusch were on duty when Nelson committed suicide, and that they were trained in suicide prevention.  (Docket Entry No. 101 at 7).  The record does not show that any of the individual defendants was subjectively aware that Nelson was at a substantial risk of committing suicide, or that they were objectively unreasonable in their actions.  And Landry has not rebutted their entitlement to qualified immunity.  Lane, Peach, Beusch, Cruz, and Lambi are entitled to qualified immunity, and summary judgment is granted on the § 1983 claims against each of them.

Sharon Lambi also argues that Landry's § 1983 claims against her are frivolous and seeks attorney's fees on that basis.  (Docket Entry No. 89 at 35–36).  Landry did not respond.  The parties agreed at the Rule 16 initial conference to "submit attorney's fees issues to the court by affidavit after liability and damages are resolved."  (Docket Entry No. 62 at 2).  Lambi's request for attorney's fees on the § 1983 claim is denied, without prejudice, with leave to refile after liability and damages are resolved.

### B.    The Americans With Disabilities Act and Rehabilitation Act Claims

Landry also asserted disability-discrimination claims against Harris County and the Texas Department of Criminal Justice under Title II of the Americans with Disabilities Act and § 504 of the Rehabilitation Act.  (Docket Entry No. 41 at 18–21).  Landry seeks compensatory damages, alleging that the defendants failed to accommodate Nelson's suicide risk.  The defendants argue that Landry has not produced evidence of intentional discrimination.  Landry did not respond.

The Fifth Circuit's opinion in *Smith v. Harris County*, 956 F.3d 311 (5th Cir. 2020), is instructive.  In *Smith*, the court affirmed summary judgment for Harris County on the plaintiff's

ADA and Rehab Act claims, which she brought after her son committed suicide by hanging at the Harris County Jail.  *Smith*, 956 F.3d at 314.   The Fifth Circuit held that a claim for compensatory damages under the ADA or the Rehab Act requires the plaintiff to prove intentional discrimination, which in turn requires that the defendant "at least have actual notice" that accommodation is required.  *Id.* at 318.   Deliberate indifference is not enough.  *Id.*   The court held that the Jail employees did not intentionally discriminate against the plaintiff's son by failing to implement suicide-prevention measures because the employees had no actual notice that these measures were needed.  *Id.* at 319.

Landry did not respond, much less identify evidence, demonstrating that the Harris County Jail employees, or the Texas Department of Criminal Justice employees, had actual notice that further accommodations were needed for the suicide risk.  To the contrary, the record shows that Harris County Jail medical staff admitted Nelson to the mental health unit and placed him on suicide precautions, and continued to examine him and perform suicide-risk assessments when needed.  Texas Department of Criminal Justice employees conducted an intake screening, which included a psychological questionnaire, and determined that Nelson was not then a suicide risk.  The record does not show that the defendants had actual notice that Nelson required more treatment or monitoring than what they provided, and it cannot sustain a finding that any of the defendants intentionally discriminated against Nelson because of his suicide risk.   Summary judgment is granted on Landry's ADA and Rehab Act claims.

### C.    The Failure-to-Fund Claim

Landry asserted a separate municipal-liability claim against Harris County for allegedly failing to sufficiently fund the Harris County Jail.  Landry alleges that by failing to provide proper mental-health care for its inmates, Harris County was "deliberately indifferent to the

safety and psychiatric needs of its inmates who demonstrate or may develop mental health needs." (Docket Entry No. 41 at 26).

Harris County argues that no evidence supports Landry's failure-to-fund claim. (Docket Entry No. 89 at 68–69). As with Landry's § 1983 claims, she has not demonstrated an underlying constitutional violation. Landry did not address this claim in her response. She has not identified evidence that creates a genuine or material factual dispute. "When a defendant moves for summary judgment and identifies a lack of evidence to support the plaintiff's claim on an issue for which the plaintiff would bear the burden of proof at trial, then the defendant is entitled to summary judgment unless the plaintiff is able to produce 'summary judgment evidence sufficient to sustain a finding in plaintiff's favor on that issue.'" *James v. State Farm Mut. Auto. Ins. Co.*, 743 F.3d 65, 68 (5th Cir. 2014) (quoting *Kovacic v. Villarreal*, 628 F.3d 209, 212 (5th Cir. 2010)). Summary judgment is granted on Landry's failure-to-fund claim against Harris County.

### D.     The Medical-Malpractice Claims

Landry asserted medical-malpractice claims under Chapter 74 of the Texas Civil Practice and Remedies Code against Sharon Lambi, alleging that Lambi prescribed Nelson medication with known psychiatric side effects, while knowing of Nelson's suicide risk, and that she failed to provide him with psychological help. (Docket Entry No. 41 at 32–33).

A medical-malpractice claim under Texas law requires the plaintiff to show that: (1) the defendant had a duty to comply with a specific standard of care; (2) the defendant breached that duty of care; (3) the plaintiff was injured; and (4) the defendant's breach proximately caused the plaintiff's injury. *See Price v. Divita*, 224 S.W.3d 331, 336 (Tex. App.—Houston [1st Dist.]

2006, pet. denied) (citing *IHS Cedars Treatment Ctr. v. Mason*, 143 S.W.3d 794, 798 (Tex. 2004)).

A defendant is the cause-in-fact of a plaintiff's injury only if the defendant's breach of the standard of care "was a substantial factor in causing the injury 'without which the harm would not have occurred.'" *Rio Grande Reg'l Hosp., Inc. v. Villarreal*, 329 S.W.3d 594, 607 (Tex. App.—Corpus Christi-Edinburg 2010) (quoting *Lee Lewis Constr., Inc. v. Harrison*, 70 S.W.3d 778, 784 (Tex. 2001)). A plaintiff does not establish cause-in-fact by alleging that the defendant's conduct created a condition that made the harm possible. *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995). Instead, a plaintiff must show that the defendant's conduct was "the proximate, and not the remote, cause of the resulting injuries . . . [and] justify the conclusion that such injury was the natural and probable cause of the result thereof." *Id.* (quoting *Boyd v. Fuel Distribs., Inc.*, 795 S.W.2d 266, 272 (Tex. App.—Austin 1990, writ denied). The defendant's conduct cannot be too far removed from the plaintiff's injuries. *Mason*, 143 S.W.3d at 799.

Lambi argues that although she owed Nelson a duty to "comply with a specific standard of care with regard to her medical treatment of Nelson," Landry "failed to allege facts sufficient to show that Lambi breached her duty of care or proximately caused Nelson's death." (Docket Entry No. 89 at 34). Lambi states that she did not have suicide-prevention training. She worked in the Jail's Chronic Care Center, where she treated patients for such chronic conditions as asthma, diabetes, and blood disorders. (Docket Entry No. 90-25 at 2). Lambi testified in her deposition that she was unaware of any psychiatric side effects of the blood-pressure medication that she prescribed to Nelson. (*Id.* at 8). She also testified that several mental-health doctors saw Nelson after her, and that none of them modified this prescription. (*Id.* at 19–20).

25

Landry did not respond.  She has not identified record evidence to support her malpractice claim against Lambi.  Nor does the record show that Lambi caused Nelson's suicide.  The fact that multiple mental-health doctors examined Nelson after Lambi, and did not change his medication, breaks any possible causal link between Lambi's prescription and Nelson's suicide.  Summary judgment is granted on Landry's malpractice claim against Lambi.

Lambi also argues that Landry failed to comply with § 74.351(a) of the Texas Civil Practice and Remedies Code, which requires a plaintiff bringing a medical-malpractice claim to serve an expert report on the health-care provider defendant within 120 days of the defendant's answer.  TEX. CIV. P. & REM. CODE § 74.351(a).  Under subsection b of § 74.351, "the court, on the motion of the affected physician or health care provider, shall" award the defendant reasonable attorney's fees and costs and dismiss the claim with prejudice.  *Id.* § 74.351(b).  Because Landry did not serve an expert report, or designate any expert, Lambi requests attorney's fees under § 74.351(b).  Section 74.351, however, does not apply in federal court.  *See Passmore v. Baylor Health Care Sys.*, 823 F.3d 292, 297 (5th Cir. 2016) (Texas Civil Practice and Remedies Code § 74.351 "directly collides" with Federal Rules of Civil Procedure 26 and 37 and does not apply in federal court).  Lambi's fee request under § 74.351, for defending Landry's malpractice claims, is denied.

## E.    The Wrongful-Death Claims

Landry also asserted state-law wrongful-death claims against all the defendants except the Texas Department of Criminal Justice, for allegedly failing properly to treat and monitor Nelson, and failing to warn the Gurney Unit of Nelson's suicidal history.  (Docket Entry No. 41 at 34).  Landry sued under Texas Civil Practice and Remedies Code §§ 71.002 and 71.021.  Under § 71.002, a "person is liable for damages arising from an injury that causes an

individual['s] death if the injury was caused by the persons or his agents or servants wrongful act, neglect, carelessness, unskillfulness, or default." *Id.* § 71.002. In Texas, a negligence claim requires "a legal duty owed by one person to another, a breach of that duty, and damages proximately caused by the breach." *Nabors Well Servs., Ltd. v. Romero*, 456 S.W.3d 553, 562 (Tex. 2015) (quoting *D. Houston, Inc. v. Love*, 92 S.W.3d 450, 454 (Tex. 2002)).

The parties did not address Landry's wrongful-death claims, or whether Texas's sovereign immunity to those claims is waived by the Texas Tort Claims Act. *See Hobart v. City of Stafford*, 784 F. Supp. 2d 732, 758–59 (S.D. Tex. 2011) (citing *City of Amarillo v. Martin*, 971 S.W.2d 426, 427 (Tex. 1998)) (a municipality is immune from tort liability unless the Texas Tort Claims Act waives immunity). But the individual defendants moved for summary judgment on all of Landry's claims, asserting qualified and official immunity. Under Texas law, official immunity protects government employees "from suit arising from the performance of their (1) discretionary duties in (2) good faith as long as they are (3) acting within the scope of their authority." *Rockwell v. Brown*, 664 F.3d 985, 993 (5th Cir. 2011) (quoting *City of Lancaster v. Chambers,* 883 S.W.2d 650, 653 (Tex. 1994)). The standard is "substantially the same" as for qualified immunity, but without the requirement of a clearly established right. *Id.* "Rather, Texas's good-faith test 'focuses solely on the objective legal reasonableness of the officer's conduct.'" *Id.* (quoting *Cantu v. Rocha*, 77 F.3d 795, 808–09 (5th Cir. 1996)).

As in the qualified immunity discussion above, the record does not support a finding that any of the individual defendants acted objectively unreasonably. Landry has not identified record evidence that creates a genuine factual dispute material to determining the reasonableness of the individual defendants' conduct. And "[w]hen the basis for liability is *respondeat superior* and the employee is entitled to official immunity, so too is the government entity." *Hobart*, 784

F. Supp. 2d at 760 (citing *Dewitt v. Harris Cty.*, 904 S.W.2d 650, 653 (Tex. 1995)).  Summary judgment is granted on Landry's wrongful-death claims against the individual defendants and Harris County.

  **F. The Survival Claim**

  Landry asserted a survival claim on Nelson's behalf, alleging that he died due to the defendants' neglect, deliberate indifference, and other wrongful acts.  (Docket Entry No. 41 at 35).  Under Texas law, a cause of action for personal injury survives the death of the injured "to and in favor of the heirs, legal representatives, and estate of the injured person."  TEX. CIV. PRAC. & REM. CODE § 71.021.  Because summary judgment is granted on all of Landry's other claims, and the record does not support claims under § 1983, for negligence, or for wrongful death, summary judgment is granted on Landry's survival action.

**IV. CONCLUSION**

  Summary judgment is granted on all of Landry's claims against all defendants.  This case is dismissed, with prejudice.  Final judgment is entered by separate order.

  SIGNED on June 10, 2020, at Houston, Texas.

           _____

               Lee H. Rosenthal
           Chief United States District Judge